**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TYRONE RICHARDSON,

     Petitioner,                       Civil No. 2:07-CV-13405
                                              HONORABLE ARTHUR J. TARNOW
v.                                       UNITED STATES DISTRICT JUDGE

MARY BERGHUIS,

     Respondent,
_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS, DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND GRANTING LEAVE TO APPEAL IN FORMA PAUPERIS

     Tyrone Richardson, ("petitioner"), confined at the Brooks Correctional Facility in Muskegon Heights, Michigan, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. [1] In his *pro se* application, petitioner challenges his conviction for manslaughter, M.C.L.A. 750.321; felon in possession of a firearm, M.C.L.A. 750.224f; felony firearm, M.C.L.A. 750.227b; and being a fourth felony habitual offender, M.C.L.A.

---

[1] When petitioner originally filed his petition for writ of habeas corpus, he was incarcerated at the Saginaw Correctional Facility, but has since been transferred to the Brooks Correctional Facility. The only proper respondent in a habeas case is the habeas petitioner's custodian, which in the case of an incarcerated habeas petitioner would be the warden of the facility where the petitioner is incarcerated. *See* Rule 2(a), 28 foll. U.S.C. § 2254. Therefore, the Court substitutes Warden Mary Berghuis in the caption.

769.12.  For the reasons stated below, the petition for writ of habeas corpus is **DENIED.**


## I.  Background

Petitioner was originally charged with first-degree murder, felon in possession of a firearm, and felony-firearm.  Following a jury trial in the Wayne County Circuit Court, petitioner was found guilty of the lesser included offense of  manslaughter and guilty as charged of the remaining two offenses. [2]  Petitioner was sentenced to fourteen to thirty years on the manslaughter conviction, two to five years on the felon in possession of a firearm conviction, and received a consecutive two year sentence on his felony-firearm conviction.

This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

> This case arose out of a February 21, 2000 shooting that occurred in the parking lot of the House of Vino party store after a brief encounter between Richardson and Howard, who did not know each other. Accounts of the events leading up to the shooting varied.  At trial, prosecution witness Malcolm Branch testified that he had driven his friend Howard and his cousin Johnnie Wallace to the House of Vino so Howard could buy some cigarettes. Branch explained that his car was a two-door model from the mid-seventies that would not operate in reverse.  Because of this limitation, when Branch pulled into the parking lot, he made a U-turn and parked with the passenger side next to the entrance so that he could leave the parking lot without

_____

[2]   The briefs on appeal to the Michigan Court of Appeals indicate that Petitioner was convicted of voluntary manslaughter, although the order of conviction, judgment of sentence, and claim of appeal to the Michigan Court of Appeals indicate that Petitioner was convicted of involuntary manslaughter.  The jury, however, was instructed on the lesser included offense of voluntary manslaughter, but not involuntary manslaughter.

backing up. Branch estimated that the car was parked between fifteen and twenty feet from the door.

According to Branch, when he, Wallace, and Howard were leaving the store, Branch said "what's up?" to a man from the neighborhood named Fred Wilson, also known as "Smoke," who was on his way into the store. Behind "Smoke," Branch saw a man he knew as "T-Bone" and later identified as Richardson. Branch noticed that Richardson and Howard had made eye contact and were staring at each other. According to Branch, Howard asked, "What the fuck is the problem?" As Branch proceeded to the driver's side of his car, he saw that Richardson had come out of the store and begun talking to a man who then handed him something. Branch identified the second man as James Burbridge.

At that point, Branch heard either Wallace or Howard say, "they got a gun." Branch turned around and began talking to Richardson, who was holding the gun in his right hand and pointing it toward the ground. By this time, Wallace had gotten into the back seat of Branch's car and Howard was in the front passenger seat. Branch told Richardson "that it wasn't like that, that I know his boy Smoke from the same hood." When Branch heard Richardson respond, "It's all good from the Projects," he thought the situation was resolved, because Richardson was still pointing the gun toward the ground. However, when Branch got in the car and began driving away, he heard gunshots, and saw that Richardson had fired the gun, breaking the car's rear window. Branch saw that Howard had been shot, and Branch later realized that he himself had been shot in the leg. Branch drove to a friend's house for help, and when he got out of the car, Wallace drove off with Howard. Howard later died from the two gunshot wounds he sustained, one of which entered his right ribcage, and one of which entered his right upper arm.

Branch explained that he did not go immediately to the hospital because he had traffic warrants and unpaid child support payments, and he did not want to go to jail. When he finally decided to go to the hospital, he told them he was "Arthur Lee Smith," and he gave police the same false name and an incorrect birth date and social security number when they questioned him about the incident. Branch gave the same false information under oath at two previous hearings in the case, and did not tell his attorney his real name until the week before trial. Branch admitted having been convicted for receiving and concealing stolen property in 1994 or 1995. On cross-examination, Branch acknowledged that he had given a previous statement indicating that there was no one with Richardson except "Smoke"; however, he explained that he had not recalled seeing Burbridge when he

gave his statement.  Branch also admitted that he had previously identified his shooter as a man named Antonio or Andre.

Branch said he did not know Richardson before this incident, had never seen him before, and had no problems with him in the past.  Branch said he was also unaware of any problems that Richardson might have had with Howard or Wallace.  Branch testified that while he was trying to convince Richardson to put the gun away, Howard's car window was down, and Branch could see his arm or some part of his head sticking out of the window. Branch also testified that sometime after the shooting, a man who identified himself as T-Bone called him and said that "[h]e didn't mean to shoot me, and he would give me a package not to testify."

According to Wallace's account of the incident, Richardson walked into the store as they were walking out, and he and Howard began staring at each other but did not say anything.  Howard then asked Wallace and Branch whether they knew Richardson, but Wallace had never met him before. Wallace testified that Howard did not have a problem with Richardson, and that the only thing Howard said about him was, "do we know him?"

As the men were getting into the car, Richardson came out of the store. Wallace noticed two other men standing near Richardson.  Wallace testified he saw one of these men hand Richardson a gun.  Wallace heard Branch tell Richardson "we was straight, we ain't like that, you know, we ain't gotta have no guns"; but Richardson did not respond. Meanwhile, Howard had rolled down his car window and started talking to Richardson also, telling him that everything was okay.  Both Branch and Wallace testified that Howard did not have a gun.  Wallace testified that they thought the situation had been resolved, but when they pulled away, Richardson began shooting.  Wallace heard Richardson say one thing before he began shooting: "From the projects."  Wallace testified that, as far as he knew, Richardson had never had any problems with him, Howard, or Branch in the past.  Wallace admitted referring to Branch as "Arthur Smith" in his statement to the police, as well as in court under oath, because he knew that Branch had outstanding warrants and was using an alias.

Fred Wilson, the man known as "Smoke," testified that when he arrived at the House of Vino, he recognized Burbridge looking at the videotapes for sale just outside the store's door, and he saw Wallace, Howard, and Branch coming out of the store.  As Wilson entered the store, Richardson came in behind him.  Wilson noticed that one of the three men was looking at Richardson "in an evil way" and saying some "cussing words" to him, but Richardson did not respond. As Wilson was leaving the counter after making

4

his purchase, he heard gunshots. Wilson said that none of the men had appeared to be armed, but Burbridge was holding a bag as he was standing outside the door.

According to Richardson's account, he saw Burbridge with the man selling videos as he went into the store, and also saw Wilson, who walked up to the door of the store at the same time he did. Richardson stopped and picked out a video, and told the man he would pay for it on his way out when he had some change. Richardson noticed two men closely followed by a third man, none of whom he recognized, leaving the store. When Richardson saw that Wilson was talking to the men, Richardson acknowledged them by nodding his head and saying, "What's up?" According to Richardson, Howard "had a look on his face like, you know, he was mad at the world." When Richardson asked Howard "What's up?," Howard "went off" on him and swore at him, but Richardson responded only by laughing at him, shaking his head, and continuing walking into the store. Richardson bought a six-pack of beer and a bag of potato chips, stood in line, paid for them, then left the store carrying these items.

On his way out, Richardson stopped and put his bag of purchases on the ground, and the man handed him the video he had chosen earlier. Richardson put the video in the bag. As Richardson reached into his pocket to get the money to pay for the video, a car pulled up and stopped in front of him, and Richardson recognized the men in the car as the three men he had seen earlier. Richardson testified, "My heart skipped a beat because I seen the same look on [Howard's] face that I seen in the store." According to Richardson, Howard rolled his window down and said "What's funny now, mother-," then pointed a gun out the window. Richardson "instantly panicked," pulled out his gun, and fired. Richardson testified that he was in fear for his life when he pulled out his gun. Richardson explained that he carried a gun because he had been the victim of an attempted carjacking and had been shot in the chest. Richardson said he did not see whether his shots hit anyone, and that he was "tryin' to run" when he tripped and fell over his bag of merchandise. When asked whether he had done anything aggressive that would have provoked anyone to shoot at him, Richardson responded, "Not at all."

Richardson denied that he had been standing outside the door for five minutes before the shooting occurred, estimating that only twenty or thirty seconds elapsed between when he left the store and when Howard pulled a gun, and that he did not have time to run. Richardson testified that he did not know whether Howard ever fired his gun, because when he saw the gun pointed at him, he "panicked" and "pulled my gun out and shot, and was

running; started shootin' and ran."  Richardson testified that he did not see the car drive away and did not know whether he hit the car because he was shooting without looking as he was trying to get away.

On cross-examination, Richardson admitted giving an alias to a judge when pleading to a felony in 1999.  Richardson denied saying "I'm from the projects," and also denied being from the projects, although he admitted spending time there.  Richardson testified that he had been convicted of receiving and concealing stolen property over a hundred dollars in 1994.  Richardson denied calling Branch to offer him a "package" for not testifying.

Diane Kovach, who witnessed the incident, testified for the defense. Kovach stated that she was walking towards the House of Vino when she saw Branch's car come towards her as though it was leaving, then it slowed down in front of the doorway.  Kovach testified that the passenger window was down and "they started screaming profanity ... the F word was used several times."  Kovach noticed that they were looking towards the door of the store, and as the car slowed further, she saw that the passenger was holding a gun out the car window.  She heard more profanity, saw a man in the doorway duck, and then she heard gunshots.  Kovach testified that she thought the person in the car fired first, but could not be sure because she had turned around; however, she was sure that the person in the car was first to draw a gun.  Kovach testified that she did not know any of the men involved.

Officer Eugene Fitzhugh and a partner photographed the crime scene as well as Branch's car.  Fitzhugh testified that his examination of the outside of the House of Vino revealed no firearm damage.  Officer Donald Rem, an evidence technician, testified that the damage to the car was caused by bullets fired into the car from outside of it.  Rem's investigation indicated that five shots entered the car: two fired directly into the passenger side, one at an angle, one from directly behind the car, and one whose trajectory could not be determined.  Officer David Pauch testified that all the slugs recovered from the car were fired from the same weapon.
*People v. Richardson,* No. 244067, 1-4 (Mich.Ct.App. December 14, 2004).

Petitioner's conviction was affirmed on appeal. *Id., lv. den.* 474 Mich. 853, 702

N.W.2d 584 (2005).  Petitioner filed a post-conviction motion for relief from judgment

pursuant to M.C.R. 6.500, *et. seq.,* which the trial court denied. *People v. Richardson,*

No. 01-9182 (Wayne County Circuit Court, June 28, 2006).  The Michigan appellate

courts denied petitioner leave to appeal. *People v. Richardson,* No. 271858

(Mich.Ct.App. February 14, 2007); *lv. den.* 479 Mich. 861, 735 N.W.2d 257 (2007).

Petitioner seeks a writ of habeas corpus on the following grounds:

I. Petitioner was deprived of his right to due process and a fair trial under the Fourteenth Amendment to the United States Constitution, when the learned trial judge allowed the offense of manslaughter to go to the jury over defense counsel's objection, and in so doing, did not distinguish between voluntary and involuntary manslaughter.

II. Petitioner was deprived of his right to due process and a fair trial under the Fourteenth Amendment to the United States Constitution, where the evidence produced by the prosecution was insufficient and defense counsel's motion for a directed verdict of acquittal on the charge of first degree murder was denied at the close of the prosecution's proofs.

III. Petitioner was deprived of his right to due process and a fair trial under the Fourteenth Amendment to the United States Constitution, where the learned trial judge when instructing on the step order of consideration, failed to explain to the jury that they could return a verdict of not guilty on Petitioner's affirmative defense of self-defense, thus shifting the burden of proof on Petitioner to prove self-defense.

IV. Petitioner was deprived of his right to due process under the Fourteenth Amendment to the United States Constitution where the court used inaccurate information of a prior record in sentencing Petitioner, and where the court sentenced Petitioner under a misapprehension of the guidelines where there was three different sets of guideline information scored and it is not known which guideline score was accurate.

V. Petitioner was deprived of his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution when trial counsel, after advancing a self-defense theory did not recognize and failed to object to the trial court's omittance [sic] of his theory to the jury as a option for a not guilty verdict, thereby undercutting Petitioner's substantial defense, and when counsel after reading the presentence report(s) did not recognize that Petitioner was being sentenced with inaccurate information; and for failing to recognize that the trial judge gave no reasons for sentencing Petitioner to an disproportionate term of years, and when counsel on appeal as of right failed to raise the substantial claims now being raised.

## II. Standard of Review

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

## III. Discussion

**A. Claims # 1 and # 3. The instructional error claims.**

The Court will discuss petitioner's first and third instructional error claims together for judicial clarity.

Respondent contends that a portion of petitioner's first claim, as well as his remaining claims, are procedurally defaulted. "[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003). "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix v Singletary*, 520 U.S. 518, at 525 (1997). In this case, the Court finds that the interests of judicial economy are best served by addressing the merits of these claims. *See Curtis v. Lafler,* No. 2008 WL 4058597, * 9 (E.D. Mich. August 28, 2008).

The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack upon the constitutional validity of a state court conviction is even greater than the showing required in a direct appeal. The question in such a collateral proceeding is whether the ailing instruction so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even "universally condemned", and an omission or incomplete instruction is less likely to be prejudicial than a misstatement of

the law. *Henderson v. Kibbee*, 431 U.S. 145, 154-155 (1977). The challenged

instruction must not be judged in isolation but must be considered in the context of the

entire jury charge. *Jones v. United* States, 527 U.S. 373, 391 (1999). Further, any

ambiguity, inconsistency or deficiency in a jury instruction does not by itself necessarily

constitute a due process violation. *Waddington v. Sarausad*, 129 S.Ct. 823, 831

(2009). It is not enough that there might be some "slight possibility" that the jury

misapplied the instruction. *Id.* Federal habeas courts do not grant relief, as might a

state appellate court, simply because a jury instruction may have been deficient in

comparison to a model state instruction. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

Petitioner first argues that the trial court erred in instructing the jury on the lesser

included offense of voluntary manslaughter, when there was no evidence to support

this instruction.

Although a defendant's due process rights may be violated if a jury is instructed

on an offense not included in the information or the indictment and the defendant did

not have notice that he might be charged with that offense, an instruction on a lesser

included offense may be given even over the defendant's objection, because a

defendant has sufficient notice when charged with the greater offense that he may also

have to defend against the lesser included offense. *See Seymour v. Walker,* 224 F. 3d

542, 558 (6th Cir. 2000)(collecting cases). The Michigan Supreme Court has held that

manslaughter is a neccesarily lesser included offense of murder in Michigan. *See*

*People v. Mendoza,* 468 Mich. 527, 544-45; 664 N.W. 2d 685 (2003). Because

voluntary  manslaughter is a necessarily lesser included offense of first-degree murder,

the trial court did not violate petitioner's due process rights by instructing the jury on

voluntary manslaughter as a lesser included offense, even though it was not requested

by petitioner. *Seymour,* 224 F. 3d at 558; *See also McHam v. Workman,* 247 Fed.

Appx. 118, 120-21 (10th Cir. 2007)(murder defendant was not constitutionally entitled to

preclude state trial court from *sua sponte* giving jury instruction on lesser included

offense of manslaughter, where evidence was sufficient to support giving of such

instruction).

Petitioner further contends that the judge erred in failing to distinguish between

the elements of voluntary and involuntary manslaughter when she instructed the jurors

on the lesser offense of voluntary manslaughter.

Under Michigan law, to establish voluntary manslaughter, the evidence must

establish (1) that the defendant killed in the heat of passion; (2) that the passion was

caused by an adequate provocation; and (3) that there was not a lapse of time during

which a reasonable person could control his passions. *Williams v. Withrow,* 328 F.

Supp. 2d 735, 748-49 (E.D. Mich. 2004)(*citing People v. Pouncey*, 437 Mich. 382, 388;

471 N.W.2d 346, 350 (1991)). Under Michigan law, involuntary manslaughter is the

killing of another without malice and unintentionally, but in doing some unlawful act not

amounting to a felony nor naturally tending to cause death or great bodily harm, or in

negligently doing some act lawful in itself, or by the negligent omission to perform a

legal duty. *Koras v. Robinson,* 123 Fed.Appx. 207, 215 (6th Cir. 2005)(*citing People v.*

*Clark*, 453 Mich. 572, 578; 556 N. W. 2d 820 (1996)). Voluntary manslaughter is an

intentional killing that is mitigated by the heat of passion, whereas involuntary

manslaughter is an unintentional killing. *See Hardaway v. Withrow*, 147 F. Supp. 2d
697, 711 (E.D. Mich. 2001); *rev'd on other grds,* 305 F. 3d 558 (6ᵗʰ Cir. 2002)(*citing
People v. Booker*, 208 Mich. App. 163, 171; 527 N. W. 2d 42 (1994)).

Under Michigan law, if evidence is introduced to support a defendant's  theory
that the killing was accidental, a request for an instruction on manslaughter
necessitates an instruction which distinguishes the elements of voluntary and
involuntary manslaughter. *See People v. Warren*, 65 Mich.App. 197, 201; 237 N.W.2d
247 (1975).  However, contrary to petitioner's argument, Michigan law does not require
that every time that a trial judge instructs a jury with regard to voluntary manslaughter,
the court is also required to instruct the jury with regard to involuntary manslaughter.
Instead, an involuntary manslaughter instruction is required only when either party
offered some evidence consistent with that instruction. *See People v. Heflin*, 434 Mich.
482, 499-500; 456 N.W.2d 10 (1990).  Petitioner did not argue that the shooting was
accidental, but that he shot the victim in self-defense.  "A finding that a defendant acted
in justifiable self-defense necessarily requires a finding that the defendant acted
intentionally, but that the circumstances justified his actions." *Id.* at 503.  Therefore, "a
defendant who relies entirely upon the defense of self-defense cannot expect the trial
judge to instruct the jury regarding statutory involuntary manslaughter, a crime neither
supported by the evidence nor presented to the jury by the defendant or the
prosecutor." *Id.*  Because petitioner did not introduce any evidence that the shooting
was accidental, but testified that he acted in self-defense, the trial judge was not
required to instruct on involuntary manslaughter even though she instructed the jury on

voluntary manslaughter. *Id.,* at 505; *See also People v. Heard*, 103 Mich. App. 571, 576; 303 N.W.2d 240 (1981); *People v. Livingston*, 63 Mich.App. 129, 135; 234 N.W.2d 176 (1975).

Because there was no evidence which justified a verdict of involuntary manslaughter, the trial court did not deprive petitioner of a fair trial by failing to instruct the jury on this offense. *See Scott v. Elo*, 302 F. 3d 598, 606 (6th Cir. 2002).

In his third claim, petitioner contends that the trial court judge, when she was instructing the jury on the step order of consideration for first-degree murder and the lesser included offenses of second-degree murder and voluntary manslaughter, failed to explain to the jury that they could find petitioner not guilty if they believed that petitioner acted in self-defense.

At the beginning of instructions, the trial judge instructed the jury that petitioner was presumed innocent and that the prosecutor had the burden of proving petitioner guilty beyond a reasonable doubt. (Tr. 5/8/2002, pp. 70-71). The judge subsequently explained to the jury that petitioner claimed that he acted in lawful self-defense. The judge explained the factors that should be used under Michigan law that would support a valid self-defense claim. The judge then explained that petitioner did not have to prove that he acted in self-defense, but that the prosecutor had to prove beyond a reasonable doubt that petitioner did not act in self-defense. (*Id.* at pp. 77-80). Later, the trial court judge explained the elements of first-degree murder, second-degree murder, and voluntary manslaughter, including the order of deliberations with respect to these charges. (*Id.* at pp. 81-85, 91-92).

The trial court judge's instructions adequately informed the jury that they should find petitioner not guilty if they believed that he acted in self-defense, even if the judge did not again instruct the jurors in the instruction on the order of deliberations that they could find petitioner not guilty if they believed he acted in self-defense. When the jury instructions are viewed in their entirety, the jurors were adequately advised that they should acquit petitioner if they believed he acted in self-defense. *See e.g. Hardaway v. Withrow,* 305 F. 3d 558, 565 (6th Cir. 2002)(trial court's failure to include in its instruction setting forth the elements of second-degree murder the element of the killing having been without justification or excuse did not warrant habeas relief, where trial court instructed jury on self defense and made it clear that it was not up to petitioner to prove that he had acted in self defense, but that it was up to prosecution to prove that petitioner did not act in self defense). Petitioner is not entitled to habeas relief on his first or third claims.

**B. Claim # 2. The directed verdict claim.**

Petitioner next contends that the trial court erred in failing to direct a verdict of acquittal on the first-degree murder charge that was submitted to the jury.

"[C]learly established Supreme Court law provides that a defendant has a right not to be *convicted* except upon proof of every element of a crime beyond a reasonable doubt; the Supreme Court has never held that the submission of a charge, upon which there is insufficient evidence, violates a defendant's constitutional rights where the defendant is acquitted of that charge." *Long v. Stovall*, 450 F. Supp. 2d 746, 752 (E.D. Mich. 2006)(*quoting Skrzycki v. Lafler*, 347 F. Supp.2d 448, 453 (E.D. Mich.

2004) (emphasis original)*; See also Aldrich v. Bock,* 327 F. Supp. 2d 743, 761-62 (E.D. Mich. 2004). The submission to a jury of a criminal charge constitutes harmless error where the habeas petitioner is acquitted of that charge. *Daniels v. Burke*, 83 F. 3d 760, 765, n. 4 (6th Cir. 1996); *Long,* 450 F. Supp. 2d at 752; *Aldrich,* 327 F. Supp. 2d at 761; *Johnson v. Hofbauer,* 159 F. Supp. 2d 582, 596 (E.D. Mich. 2001). In light of the fact that petitioner was acquitted of first-degree murder, any error in submitting this charge to the jury was harmless.

**C. Claim # 4. The sentencing claim.**

Petitioner next contends that his sentence was disproportionate and that it was based on inaccurate information.

Petitioner's sentences were within the statutory limits under Michigan law for manslaughter, felon in possession of a firearm, felony-firearm, and being a fourth felony habitual offender. A sentence imposed within the statutory limits is not generally subject to habeas review. *Townsend v. Burke*, 334 U.S. 736, 741 (1948); *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999). A sentence within the statutory maximum set by statute does not normally constitute cruel and unusual punishment. *Austin v. Jackson*, 213 F. 3d 298, 302 (6th Cir. 2000).

The U.S. Constitution does not require that sentences be proportionate. In *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991), a plurality of the U.S. Supreme Court concluded that the Eighth Amendment does not contain a requirement of strict proportionality between the crime and sentence. The Eighth Amendment forbids only

extreme sentences that are grossly disproportionate to the crime. *Harmelin,* 501 U.S. at 1001.

Successful challenges to the proportionality of a particular sentence in non-capital cases are "exceedingly rare." *Rummel v. Estelle*, 445 U.S. 263, 272 (1980). Federal courts will therefore not engage in a proportionality analysis except where the sentence imposed is death or life imprisonment without parole. *See Seeger v. Straub*, 29 F. Supp. 2d 385, 392 (E.D. Mich. 1998). Petitioner's claim that his sentence is disproportionate under Michigan law thus would not state a claim upon which habeas relief can be granted. *Whitfield v. Martin,* 157 F. Supp. 2d 758, 761 (E.D. Mich. 2001).

Petitioner further claims that the trial court relied on inaccurate information in scoring petitioner's sentencing guidelines.

A criminal defendant possesses a constitutional right not to be sentenced on the basis of "misinformation of constitutional magnitude." *Roberts v. United States*, 445 U.S. 552, 556 (1980); *Townsend v. Burke*, 334 U.S. 736 at 741 (stating that reliance on "extensively and materially false" information, which the prisoner had no opportunity to correct, violates due process of law). In order to prevail on a claim that a trial court relied on inaccurate information at sentencing, a habeas petitioner must demonstrate that the sentencing court relied upon this information and that it was materially false. *See Welch v. Burke*, 49 F. Supp. 2d 992, 1007 (E.D. Mich. 1999). Where a petitioner fails to demonstrate in his or her petition that the sentencing court relied upon materially false information in imposing sentence, this claim is without merit. *See Thomas v. Foltz*, 654 F. Supp. 105, 108 (E.D. Mich. 1987).

16

At the time of sentencing, there was a dispute over whether petitioner had a prior conviction from 1992 for possession with intent to deliver under 50 grams of cocaine or possession of under 25 grams of cocaine. Possession with intent to deliver cocaine is a high severity felony conviction under Prior Record Variable (PRV) 1 of the Michigan Sentencing Guidelines, for which petitioner would have received twenty five points, whereas possession of cocaine is a low severity felony under PRV 2, for which petitioner would have received 10 points. If petitioner's prior conviction was possession with intent to deliver cocaine, his sentencing guidelines range would be E-5, or 50-200 months. However, if petitioner's prior conviction was possession of cocaine, his sentencing guidelines range would be D-5, or 43-172 months. The judge indicated that she would give petitioner the benefit of the doubt to petitioner and score petitioner under the sentencing guidelines range of D-5, or 43-172 months. (Sent Tr. , pp. 2-5).

In rejecting petitioner's claim on post-conviction review, the judge noted that she had adopted petitioner's argument that the sentencing guidelines range should be 43-172 months and had stayed within those guidelines by sentencing him to fourteen to thirty years in prison. *People v. Richardson,* No. 01-9182, * 2 (Wayne County Circuit Court, June 28, 2006).

There is no indication that the trial court judge scored petitioner's sentencing guidelines range based on an assumption that petitioner's 1992 conviction was for possession with intent to deliver under 50 grams of cocaine. Because petitioner has failed to show that the factors considered by trial court at sentencing were materially

false or improperly considered, he is not entitled to habeas relief on his claim. *See*

*Barber v. Birkett*, 276 F. Supp. 2d 700, 714 (E.D. Mich. 2003).

### D.  Claim # 5.  The ineffective assistance of counsel claim.

Petitioner finally claims that he was deprived of the effective assistance of trial

and appellate counsel.

To show that he was denied the effective assistance of counsel under federal

constitutional standards, a defendant must satisfy a two prong test.  First, the

defendant must demonstrate that, considering all of the circumstances, counsel's

performance was so deficient that the attorney was not functioning as the "counsel"

guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687

(1984).  In so doing, the defendant must overcome a strong presumption that counsel's

behavior lies within the wide range of reasonable professional assistance. *Id.*  In other

words, petitioner must overcome the presumption that, under the circumstances, the

challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689.  Second,

the defendant must show that such performance prejudiced his defense. *Id.*  To

demonstrate prejudice, the defendant must show that "there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." *Strickland,* 466 U.S. at 694.   The *Strickland* standard applies as well to

claims of ineffective assistance of appellate counsel. *See Whiting v. Burt,* 395 F.3d

602, 617 (6th Cir. 2005).  To prevail on his ineffective assistance of counsel claims, a

habeas petitioner must show that the state court's conclusion regarding these claims

was contrary to, or an unreasonable application of, *Strickland. See e.g. Dittrich v. Woods,* 602 F.Supp.2d 802, 807 (E.D.Mich. 2009).

Petitioner first contends that trial counsel was ineffective for failing to object to the trial judge's failure to instruct the jury that they should find petitioner not guilty if they believed that he acted in self-defense.  As indicated when addressing petitioner's third claim, *supra,* the jury instructions adequately informed the jury that they should find petitioner not guilty if they believe he acted in self-defense.  Because the jury was adequately instructed on the theory of self-defense, including that the burden was upon the prosecution to prove that petitioner did not act in self-defense, counsel was not ineffective for failing to object to the instructions that were given. *See e.g. Paprocki v. Foltz,* 869 F. 2d 281, 285-86 (6th Cir. 1989).

Petitioner next claims that counsel was ineffective for failing to object to the use of inaccurate information at sentencing.  Petitioner's claim is without merit.  First, defense counsel indicated that petitioner's sentencing guidelines should be scored only at D-5, or 43-172 months, based upon petitioner's prior conviction being only for possession of cocaine. (Sent. Tr., pp. 4-5).  Secondly, the judge agreed to sentence petitioner within that guidelines range.  Petitioner is not entitled to habeas relief on the ground that his trial counsel was ineffective for failing to object to inaccurate information at sentencing, because he failed to show that the sentencing court based his sentence on inaccurate information. *See Johnson v. Smith*, 219 F. Supp.2d 871, 883 (E.D. Mich. 2002).

Petitioner further claims that his trial counsel was ineffective for failing to object to the judge and the prosecutor using this 1992 conviction to sentence petitioner as an habitual offender, because he claims that there is a "possibility" that this conviction "does not exist." Petitioner has never provided any evidence, either to the state courts, or to this Court, to support his allegation that he does not have a prior felony conviction from 1992 for possession of cocaine. Conclusory allegations of ineffective assistance of counsel, without any evidentiary support, do not provide a basis for habeas relief. *Reedus v. Stegall,* 197 F. Supp. 2d 767, 782 (E.D. Mich. 2001); *See also Collier v. United States,* 92 F. Supp. 2d 99, 106 (N.D.N.Y. 2000)(rejecting claim that counsel was ineffective for failing to investigate the defendant's prior convictions in order to challenge defendant's sentence as a career offender, absent any evidence, other than the defendant's conclusory statements, that his prior convictions should have been given youthful offender status). The burden was on petitioner to prove the invalidity or unconstitutionality of any prior convictions which were used to charge him with being an habitual offender. *See Hobson v. Robinson,* 27 Fed. Appx. 443, 445 (6th Cir. 2001)(citing *Parke v. Raley,* 506 U.S. 20, 28-34 (1992)). Because petitioner failed to sustain this burden, he is not entitled to habeas relief on this claim.

Petitioner is not entitled to habeas relief on this ineffective assistance of trial counsel claims.

Because petitioner has failed to show that his trial counsel was ineffective, petitioner is unable to establish that appellate counsel was ineffective for failing to raise these ineffective assistance of trial counsel claims on his appeal of right. *See e.g.*

*Fautenberry v. Mitchell,* 515 F. 3d 614, 642 (6th Cir. 2008).  The Court will therefore reject this portion of petitioner's fifth claim involving the ineffective assistance of appellate counsel.

### IV. Conclusion

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings, which was amended as of December 1, 2009, requires that a district court must:

> issue or deny a certificate of appealability when it enters a final order adverse to the applicant.... If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2).
> Rule 11, Rules Governing Section 2254 Proceedings.

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Courts must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R.App. P. 22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997).  To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotes and citations omitted).

*Richardson v. Berghuis,* U.S.D.C. 07-13405

The Court finds that reasonable jurists would not debate that this Court correctly denied each of Petitioner's claims. Therefore, the Court will deny a certificate of appealability.

Although this Court will deny a certificate of appealability to petitioner, the standard for granting an application for leave to proceed *in forma pauperis* (IFP) is a lower standard than the standard for certificates of appealability. *See Foster v. Ludwick,* 208 F. Supp. 2d 750, 764 (E.D. Mich. 2002)(citing *United States v. Youngblood*, 116 F. 3d 1113, 1115 (5th Cir. 1997)). Whereas a certificate of appealability may only be granted if petitioner makes a substantial showing of the denial of a constitutional right , a court may grant IFP status if it finds that an appeal is being taken in good faith. *Id.* at 764-65; 28 U.S.C. § 1915(a)(3); Fed. R.App.24 (a). "Good faith" requires a showing that the issues raised are not frivolous; it does not require a showing of probable success on the merits. *Foster,* 208 F. Supp. 2d at 765. Although jurists of reason would not debate this Court's resolution of petitioner's claims, the issues are not frivolous; therefore, an appeal could be taken in good faith and petitioner may proceed *in forma pauperis* on appeal. *Id.*

## V.   <u>ORDER</u>

IT IS ORDERED that the Petition for Writ of Habeas Corpus is **DENIED.**

IT IS FURTHER ORDERED That a Certificate of Appealability is **DENIED.**

IT IS FURTHER ORDERED that Petitioner will be **GRANTED** leave to appeal *in forma pauperis.*


<u>S/Arthur J. Tarnow</u>
Arthur J. Tarnow
Senior United States District Judge

Dated:  August 16, 2010


I hereby certify that a copy of the foregoing document was served upon parties/counsel of record on August 16, 2010, by electronic and/or ordinary mail.

<u>S/Catherine A. Pickles</u>
Judicial Secretary